**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **KAMRAN MAJEED**, | ) | |
| | ) | |
| Plaintiff, | ) | **Case No.** |
| | ) | **Hon.** |
| v. | ) | |
| | ) | |
| **CHRISTOPHER WRAY**, Director of the | ) | |
| Federal Bureau of Investigation, in his official | ) | |
| capacity; | ) | |
| | ) | |
| **CHARLES H. KABLE,** Director of the | ) | |
| Terrorist Screening Center; in his official | ) | |
| capacity; | ) | |
| | ) | |
| **DEBORAH MOORE**, Director, Transportation | ) | |
| Security Redress (OTSR), Transportation | ) | |
| Security Administration (TSA), United States | ) | |
| Department of Homeland Security (DHS), and | ) | |
| Director of the DHS Traveler Redress Inquiry | ) | |
| Program (DHS TRIP); in his official capacity; | ) | |
| | ) | |
| **RUSSEL TRAVERS**, Acting Director of the | ) | |
| National Counterterrorism Center, in | ) | |
| his official capacity; | ) | |
| | ) | |
| **DAVID P. PEKOSKE**, Administrator, | ) | |
| Transportation Security Administration | ) | |
| (TSA), United States Department of | ) | |
| Homeland Security (DHS); in his official | ) | |
| capacity; | ) | |
| | ) | |
| **KEVIN K. MCALEENAN**, Acting Commissioner | ) | |
| United States Customs and Border Protection; | ) | |
| in his official capacity, and, | ) | |
| | ) | |
| Defendants. | ) | |

**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

1

Plaintiff, **KAMRAN MAJEED**, by and through his attorneys, CAIR Legal Defense Fund ("Council on American-Islamic Relations" or "CAIR") and CAIR-Michigan ("CAIR-MI"), states as follows:

### Introduction

1.      Through its overbroad and underinclusive No Fly List, the federal government is unlawfully depriving Kamran Majeed of his right of movement and stigmatizing him—to his friends, family, community, and others—as a dangerous terrorist.

2.      Mr. Majeed is a legal permanent resident, also known as a green card holder, who has never been arrested, charged or convicted of any crime. But Defendants have nonetheless barred him from boarding any flight crossing United States airspace. Defendants' actions have indefinitely prevented him from boarding a flight back to the United States. In essence, Defendants have exiled Mr. Majeed from his home and family.

3.      Mr. Majeed's injuries are directly attributable to Defendants' compilation and dissemination of a Terrorist Screening Database ("TSDB"), colloquially known as "the federal terror watch list" or simply "the watch list." Defendants determine placement on the watch list through extra-judicial and secret means. Many Americans, including children, end up on this secretive federal terror watch list based on mere guesses, hunches, and conjecture. Some Americans are placed on the watch list due to typos, coincidentally similar names, and outright mistakes. Defendants impose few checks or quality assurance standards before permitting names to be added. Accordingly, Defendants add names for impermissible reasons: Defendants often deem Americans to be potential terrorists based solely on their race, ethnicity, national origin, religion, or based on their exercise of constitutionally-protected rights to speech, advocacy, petition, and expression.

4.     The Terrorist Screening Database includes two sub-components: the Selectee List and the No Fly List.  Placement in the Terrorist Screening Database, or any of its subsidiary lists, inflicts severe and unwarranted consequences on listees.  Once a name is added, Defendants disseminate it broadly, in accordance with Homeland Security Presidential Directive No. 6's instructions that TSDB information should be disseminated to federal, state, local, and tribal authorities, foreign governments, to customs agents at the U.S. border, to TSA agents at airports, to corporations, and in support of "private-sector screening processes."

5.     Suddenly and without notice, Americans added to the watch list find themselves ensnared in an invisible web of visible consequences.  They are barred from flights or subjected to enhanced screening at airports, hindering their visits to family or travel for work.  Their disfavored treatment is carried out publicly, in front of travel companions, colleagues, and cameras.  In varying instances, they are also impeded from traveling on sea-faring vessels, and from obtaining visas and entry permissions from foreign governments.  They endure prolonged and intimidating screenings at land borders, including being pulled out of their vehicles at gunpoint.  They discover bank accounts have been closed, and they are ineligible to open new ones.  They are blocked from purchasing firearms, a Second Amendment right.  States will not issue them licenses or other certifications.  They lose their jobs and are unable to find new ones.

6.     Across these swaths of adverse consequences, the federal government's message is loud and clear: This person is a violent menace, a potential terrorist, likely armed and dangerous, who therefore cannot enjoy the everyday freedoms of American life.

7.     Unfortunately, the government has designed the federal terror watch lists to be accountability-free.  Persons placed on the federal terror watch list have no advance notice, no knowledge of the factual basis for their inclusion, almost no ability to correct the record, and no means of seeking removal.  Although the Department of Homeland Security operates the Traveler Redress Inquiry Program ("DHS TRIP"), ostensibly to assist Americans in obtaining information about their watch list status and correct mistakes, this resolution process is a sham.  DHS TRIP refuses to discuss specific facts and refuses to even process redress complaints, during which time innocent Americans suffer paralyzing consequences.

8.     Two leaked government documents and a governmental report, which include the March 2013 Watchlisting Guidance (Exhibit 1), the Directorate of Terrorist Identities (DTI): Strategic Accomplishments 2013 (Exhibit 2), and the Department of Justice's March 2014 Audit of the Federal Bureau of Investigation's Management of Terrorist Watchlist (Exhibit 3) reveal that the care the federal government takes in creating its federal terror watch list is void of proper processing, which in turn results in life-altering consequences that flow from these illegal actions.

9.     Plaintiff Majeed is one such American.  He now seeks to vindicate the constitutional rights of himself and all Americans improperly designated as terrorists without due process, in violation of their constitutional rights.

### Parties

10.     Plaintiff Majeed Kamran is a United States legal permanent resident and a Muslim residing in Howell, Michigan.

11.     Defendant Christopher Wray is the Director of the Federal Bureau of Investigation ("FBI").  Defendant Wray is responsible for the nominations of Plaintiff and

other similarly situated American citizens and persons to the Terrorist Screening Database. Defendant Wray is being sued in his official capacity, only.

12.    Defendant Charles H. Kable IV is the current Director of the Terrorist Screening Center ("TSC"), an FBI program.  Defendant Kable develops and maintains the federal government's consolidated Terrorism Screening Database.  He accepted the nomination of Plaintiff, and continues to accept the nominations of other similarly situated American citizens and persons, to the federal terror watch list.  Defendant Kable also oversees the dissemination of the "known or suspected terrorists" stigmatizing label to state and local authorities, foreign governments, private corporations, private contractors, airlines, gun sellers, financial institutions, the captains of sea-faring vessels, and others (hereinafter collectively referred to as "governmental and private partners").  Defendant Kable is being sued in his official capacity, only.

13.    Defendant Deborah Moore is the Director of the Office of Transportation Security Redress ("OTSR"), Transportation Security Administration ("TSA"), United States Department of Homeland Security ("DHS").  Defendant Moore also serves as the Director of the DHS Traveler Inquiry Program ("DHS TRIP").  Defendant Moore is responsible for overseeing DHS TRIP, the administrative complaint process by which Plaintiff and other similarly situated American citizens and persons may challenge their nominations to the federal terror watch list.  She coordinates with other government agencies, including the Terrorism Screening Center, to resolve the complaint.  Defendant Moore is being sued in her official capacity, only.

14.    Defendant Russel Travers is the Director of the National Counterterrorism Center ("NCTC"), which is managed by the Office of the Director of National Intelligence.

5

Defendant Travers is also responsible for accepting nominations of American citizens to the federal terror watch list. Defendant Travers is being sued in his official capacity, only.

15. Defendant David P. Pekoske is Administrator of the Transportation Security Administration ("TSA"). Defendant Pekoske also oversees the dissemination of the "known or suspected terrorists" stigmatizing label to governmental and private partners. Defendant Pekoske is being sued in his official capacity, only.

16. Defendant Kevin K. McAleenan is Acting Commissioner of the United States Customs and Border Protection ("CBP"). Defendant McAleenan is responsible for implementing screening of those on the federal terror watch list. Defendant McAleenan is being sued in his official capacity, only.

## Jurisdiction and Venue

17. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this is a civil action arising under the U.S. Constitution and federal law.

18. This Court has authority to grant the declaratory relief requested herein pursuant to the Declaratory Judgment Act, 28 U.S.C. § § 2201-02, because the action presents an actual case or controversy within the Court's jurisdiction.

19. This Court has personal jurisdiction over the Defendants because they either committed a substantial part of the unlawful acts within the State of Michigan, or they expressly aimed their unlawful acts at Plaintiff who felt their effects within the State of Michigan.

20. Venue is proper under 42 U.S.C. § 1391(e)(1) because Defendants are officers or employees of agencies of the United States sued in their official capacities, because a

substantial part of the events or omissions giving rise to the claim occurred in this district, and because Plaintiff resides in this district, and the action involves no real property.

## Factual Background

### The Federal Government's Terrorist Watch List

21.    In September 2003, Attorney General John Ashcroft established the Terrorist Screening Center ("TSC") to consolidate the government's approach to terrorism screening. The TSC, which is administered by the FBI, develops and maintains the federal government's consolidated Terrorism Screening Database (the "watch list").  TSC's consolidated watch list is the federal government's master repository for suspected international and domestic terrorist records used for watch list related screening.

22.    The watch list has two primary components: the Selectee List and the No Fly List.  Persons on the Selectee List are systematically subject to extra screening at airports and land border crossings, and often find "SSSS" on their boarding passes printed by airline employees which is marked to indicate a passenger's watch list status to airline employees and screeners.  Persons on the No Fly List, including Plaintiff, are prevented from boarding flights that fly into, out of, or even through United States airspace.

23.    Defendant TSC disseminates records from its terrorist watch list to other government agencies that in turn use those records to identify suspected terrorists.  For example, applicable TSC records are provided to TSA for use by airlines in pre-screening passengers and to CBP for use in screening travelers entering the United States by land.

24.    Upon information and belief, Defendants disseminated the records of Plaintiff from their terrorist watch list to other government agencies, including Defendant TSA for

use by airlines in pre-screening Plaintiff, and Defendant CBP for use in screening Plaintiff upon entering the United States.

25.     Upon information and belief, Defendants disseminated the records pertaining to Plaintiff from their terrorist watch list to foreign governments with the purpose and hope that those foreign governments will constrain the movement of Plaintiff in some manner.

26.     Upon information and belief, Defendants' intention in disseminating watch list records, including those of Plaintiff and similarly situated American citizens, as widely as possible is to constrain their movements, not only within the United States, but abroad as well.  For example, some countries detain individuals listed on the federal terror watch list who enter their borders, question those individuals at the behest of United States officials, or altogether prevent those individuals from even entering those countries.

27.     Thus, while the TSC maintains and controls the database of suspected terrorists, it is the front-line agencies like the TSA that carry out the screening function.  In the context of air travel, when individuals make airline reservations and check in at airports, the front-line screening agency, like TSA and CBP, conducts a name-based search of the individual, including that of Plaintiff, to determine whether he is on a watch list.

28.     While agencies throughout the federal government utilize the federal terror watch list to conduct screening, listed persons are subject to a comprehensive portfolio of consequences that cover large aspects of their lives.

29.     Indeed, Defendants disseminated the federal terror watch list to government authorities, private corporations and individuals with the purpose and hope that these entities and/or individuals will impose consequences on those individuals Defendants have listed, including Plaintiff.

30.     Upon information and belief, the status of Plaintiff and similarly situated American citizens as known or suspected terrorists on the federal terror watch list diminishes and even imperils their ability to access the financial system.

31.     Defendants have provided access to the federal terror watch list, and banks have closed the bank accounts of individuals listed on the federal terror watch list and financial companies have declined to allow some listed individuals to make wire transfers.

32.     Moreover, upon information and belief, family-based immigration applications filed by Plaintiff and similarly situated American citizens are delayed indefinitely due to an "FBI name check" and not adjudicated, thereby denying Plaintiff and similarly situated American citizens of the rights that flow from citizenship, including the ability to sponsor lawful permanent residency for immediate relatives living abroad.

33.     Among the entities and individuals to which the federal government disseminates its federal terror watch list are state and local authorities, foreign governments, corporations, private contractors, airlines, gun sellers, car dealerships, financial institutions, and captains of sea-faring vessels, among others.

34.     In fact, in 2015, former Director of the Terrorist Screening Center Christopher Piehota gave an exclusive interview to CNN and stated the following, in relevant part:

> It's concerning that our partners don't use all of our data. We provide them with tools. We provide them with support, and I would find it concerning that they don't use these tools to help screen for their own aviation security, maritime security, border screening, visas, things like that for travel.[1]

---

[1] First on CNN: Top U.S. intel official: Europe not taking advantage of terror tracking tools, CNN, *available at*: http://www.cnn.com/2016/04/07/politics/christopher-piehota-us-intel-europe-terror-tracking/

35.     Former TSC Director Piehota went on to state that the United States shares its federal terror watch list with the European Union, but that European Union countries don't systematically utilize it to identify suspected terrorists or screen migrants coming.

36.     Upon information and belief, because the names of Plaintiff and similarly situated American citizens are included on the federal terror watch list, their names were disseminated to state and local authorities, foreign governments, corporations, private contractors, airlines, gun sellers, car dealerships, financial institutions, the captains of sea-faring vessels, among other official and private entities and individuals.

37.     Because the federal government disseminates its federal terror watch list to foreign governments, listed persons, including Plaintiff and similarly situated American citizens, are often not allowed to enter other nations.  This is because the United States is telling other nations, without any modicum of due process, that thousands of its own citizens are "known or suspected terrorists."

38.     The federal government, through Defendants, disseminates its federal terror watch list to state and local police officers which allows those officers to query the names of persons, including Plaintiff, if for example, the listed individual is pulled over for routine traffic violations.

39.     Disseminating the federal terror watch list to state and local police officers creates a dangerous situation insofar as the federal terror watch list effectively directs state and local officers to treat thousands of Americans, including Plaintiff, charged with or convicted of no crime yet who are listed as a "known or suspected terrorist" as extremely dangerous.

40.     With the advent and deployment of automatic license plate readers by police departments across the country, local and state authorities have relied heavily upon a driver's watch list status as the basis of a traffic stop, including Plaintiff and similarly situated American citizens.

41.     Being on the federal terror watch list can prevent listed persons, including Plaintiff and similarly situated American citizens and lawful permanent residents, from purchasing a gun.  For example, New Jersey passed a law in 2013 that banned persons on the federal terror watch list from owning guns.  Additionally, Connecticut is in the process of setting up an institutional mechanism to prevent individuals whose names are included on the federal terror watch list, such as Plaintiff, from being able to buy a gun in the state of Connecticut.

42.     Accordingly, Plaintiff and similarly situated American citizens are unable to purchase guns in states that ban persons on the federal terror watch list from owning guns.

43.     Because the federal government conducts a security risk assessment that includes querying the federal terror watch list prior to issuing a license to commercial drivers to transport hazardous materials, being on the federal terror watch list can prevent listed persons, including Plaintiff and similarly situated American citizens, from obtaining or renewing their Hazmat license.

44.     Being on the federal terror watch list can also prevent listed persons, including Plaintiff and similarly situated American citizens, from accompanying minors or passengers with disabilities to their gate, from working at an airport, or working for an airline insofar as listed persons are not allowed to enter so-called "sterile areas" of airports.

45.    Being on the federal terror watch list can also result in the listing of the false stigmatizing label of "known or suspected" terrorist on the criminal records of Plaintiff and similarly situated American citizens and lawful permanent residents, information that is publicly accessible to the general public.

46.    Defendants make the federal terror watch list available to municipal courts, which then make bail determinations based on an individual's status on the watch list.

47.    Being on the federal terror watch list can also result in the listing of the false stigmatizing label of "known or suspected" terrorist on the criminal records of Plaintiff and similarly situated American citizens, information that is publicly accessible to the general public.

48.    Being on the federal terror watch list can also result in the denial or revocation of a Federal Aviation Administration (FAA) license of Plaintiff and similarly situated American citizens.

49.    Although TSA, CBP, and other agencies may use the records provided by the TSC, it is the TSC that maintains and controls the database of suspected terrorists.

50.    Two government entities are primarily responsible for "nominating" individuals for inclusion in the terrorist watch list—Defendants NCTC and FBI.  The NCTC, which is managed by the Office of the Director of National Intelligence, relies on information from other federal departments and agencies when including alleged known or suspected international terrorists in its Terrorist Identities Datamart Environment ("TIDE") database. The NCTC reviews TIDE entries and recommends specific entries to the TSC for inclusion in the watch list.  TIDE is the main source of all international terrorist information included in the watch list.

51.     Defendant FBI, in turn, nominates to the watch list individuals with what it characterizes as suspected ties to domestic terrorism.

52.     Defendant TSC makes the final decision on whether a nominated individual meets the minimum requirements for inclusion into the watch list as a known or suspected terrorist.  TSC also decides which screening systems will receive the information about that individual.

53.     Former Director of the Terrorism Screening Center Healy has testified that in evaluating whether an individual meets the criteria for inclusion on the consolidated watch list, the TSC determines whether the nominated individual is "reasonably suspected" of having possible links to terrorism.  According to the TSC, "reasonable suspicion requires articulable facts which, taken together with rational inferences, reasonably warrant the determination that an individual is known or suspected to be or has been engaged in conduct constituting, in preparation for, in and of or related to terrorism and terrorist activities."

54.     Defendants have not stated publicly what standards or criteria are applied to determine whether an American citizen on the consolidated watch list will be placed on the No Fly List, Selectee List ("SSSS") or other list that is distributed to the TSA, CBP or other screening agencies.

55.     The standards for watch list inclusion do not evince even internal logic. Defendants define a "suspected terrorist" as an "individual who is reasonably suspected to be, or have been, engaged in conduct constituting, in preparation for, in aid of, or related to terrorism and terrorist activities based on articulable and reasonable suspicion."  In other words, Defendants place American citizens on the federal terror watch list based upon a "reasonable suspicion" that they are "reasonably suspected" of nefarious activities.  This

"reasonable suspicion" based on a "reasonable suspicion" standard does not even contain internal logic.

56.    The federal government utilizes guilt-by-association as a basis for watch list inclusion.  For example, the immediate relative of listed persons can be listed without any derogatory information—other than the bonds of family.  Nonetheless, such designation suggests that the immediate relative is him or herself engaged in nefarious activities.

57.    Being a known associate—a friend, colleague, fellow community member, etc.—of a listed individual can also provide a basis for watch list inclusion.

58.    Even if an American citizen is acquitted of terrorism charges or those charges are otherwise dismissed, the federal government retains for itself the authority to continue to include them in the watch list.

59.    For reasons unknown, Defendants also place what they call "non-investigatory subjects" on the federal terror watch list, American citizens that they have chosen not to investigate.

60.    Defendants place individuals on the federal terror watch list without any information regarding an individual's intended target.

61.    Defendants place individuals on the Selectee List without any information that they pose a threat to aviation.

62.    Defendants place individuals on the No Fly List without any information that they pose a threat to aviation.

63.    Under these practices and standards, the number of records in the consolidated watch list has swelled.  Over 1.5 million nominations to the watch list have been submitted by federal agencies since fiscal 2009.

64.    In 2013, Defendant TSC accepted 98.96 percent of all nominations made.

65.    Because of these loose standards and practices, the federal terror watch list's rate of growth has increased.  In fiscal 2009, there were 227,932 nominations to the watch list.  In fiscal 2013, there were 468,749 nominations.

66.    Upon information and belief, in 2001, there were 16 people who the federal government systematically prevented from flying.  In 2013, that number increased to 47,000.

67.    Once an American citizen has been placed on the watch list, the individual remains on the list until the agency that supplied the initial information in support of the nomination determines the individual should be removed.

68.    A 2007 GAO report found that TSC rejects only approximately one percent of all nominations to the watch list.[2]  As such, the watch list is growing at a rate of approximately 20,000 entries per year.

69.    At a March 10, 2010 Senate Homeland Security Committee hearing, Russel E. Travers, Deputy Director of the National Counterterrorism Center, stated that "[t]he entire federal government is leaning very far forward on putting people on list," and that the watch list is "getting bigger, and it will get even bigger."

70.    Defendants' 2013 Watchlisting Guidance also indicates that "[t]ravel for no known lawful or legitimate purpose to a locus of terrorist activity" can be a basis for being listed.  While a "locus of Terrorist Activity" is not defined by the document, upon information and belief, it likely includes any place where many Muslims reside.

---

[2] *See* United States Government Accountability Office Report to Congressional Requesters entitled *Terrorist Watch List Screening:  Opportunities Exist to Enhance Management Oversight, Reduce Vulnerabilities in Agency Screening Processes, and Expand Use of the List*, GAO-08-110, October 2007, at 22.

71.     The federal terror watch list's inclusion standards are so permissive and pliable and the selectee list's efficacy is at best fleetingly marginal that the inclusion standards themselves violate Plaintiff's procedural and substantive due process.

72.     The federal terror watch list diminishes, rather than enhances, our national security because the number of innocent Americans on the list is becoming so voluminous that the purpose of having a list is significantly undermined as all are being treated as the same.

73.     The consequences of being on the federal terror watch list are meted out publicly. Members of the public can witness the extra screening to which individuals on the federal terror watch list are subject, oftentimes in front of family and colleagues, including being pulled out of their car at gunpoint, being ordered to leave their vehicle with their hands held above their head, among other stigmatizing measures.

74.     Because travel is regularly done with family, friends, and community and professional contacts, a person's watch list status is revealed to travel companions. Travel companions come to learn of a person's watch list status based on how screeners treat a listee.

75.     In practice, frontline screeners disclose the status of individuals on the federal terror watch list to state and local authorities, as well as airline employees.

76.     The operation of the federal terror watch list enlists air carriers to assist the federal government in tracking passengers on the federal terror watch list.

77.     Defendants apply the federal terror watch list against Muslim Americans in a manner that is different from how they use their list against people of other faith backgrounds.

78.     Defendants use impermissible and inaccurate religious profiles in compiling the federal terror watch list.

79.     Defendants who contributed to the placement of Plaintiff and similarly situated American citizens on the federal terror watch list knew that their actions violated clearly established federal law.

80.     Defendants knew at the time they acted unlawfully that Supreme Court precedent required that, whenever a citizen is deprived of a liberty interest, the federal government must at least provide the deprived with some form of notice that a deprivation occurred.

### The Federal Government's Terror Watch List
### Is No More Effective Than a List of Randomly Selected Individuals

81.     Defendants' ability to watch list persons, including Plaintiff, who pose a threat of terrorism can be measured and described using a quantitative analysis based on factual allegations made in this Complaint as well as publicly available information describing the current operation of the federal terror watch list.

82.     Upon information and belief, the federal government has placed approximately one million persons on the federal terror watch list over the last ten years.

83.     Moreover, based on the University of Maryland's Global Terrorism Database, a project funded in part by the Department of Homeland Security, there have been less than 250 terrorist acts inside the United States over the last decade.  These terrorist acts were perpetrated by less than 250 persons.

84.     Only one of these perpetrators was designated on the federal terror watch list by the federal government prior to their criminal conduct.  This single person designated on

the federal terror watch list, however, was removed from the federal terror watch list prior to perpetrating the terrorist attack.

85.     Upon information and belief, in order to designate a person on the federal terror watch list, the federal government must first have information about that person. Because the federal government does not possess information on every person in the world, existing law enforcement and intelligence practices produce a subset of persons who the federal government can then screen against the federal terror watch list's inclusion standards.

86.     The precise size of this subset is unknown; however, a survey of law enforcement and intelligence practices indicates that the size of this subset is greater than 50 million people.

87.     Upon information and belief, the practices that produce this subset exclude some persons who do pose a threat of terrorism and include some persons who do not pose a threat of terrorism.

88.     Upon further information and belief, the federal government does not screen the entire subset of people known to it.  Moreover, Defendants do not make individual determinations as to whether each person about whom they know should be placed on the federal terror watch list.

89.     In order to designate a person on the federal terror watch list, a federal government official must make a nomination and a TSC official must accept the nomination.

90.     Upon information and belief, TSC officials accept nominations at a rate above 95 percent.

91.     Based on the facts alleged in this Complaint and the publicly known processes of the federal terror watch list, a quantitative analysis can be constructed to measure and describe the performance of the federal terror watch list.

92.     A quantitative analysis demonstrates that, in order to accomplish the federal terror watch list's stated objectives, Defendants must have at least some greater-than-random ability to identify future terrorists.  This is due to the nature of the processes Defendants utilize to place persons on the federal terror watch list and the size of the population Defendants can—if they so choose—screen against the federal terror watch list's inclusion standards.

93.     A quantitative analysis also demonstrates that Defendants' watch listing system would perform similarly if inclusion on the watch list was done via random selection instead of the existing inclusion standards Defendants utilize.

94.     A quantitative analysis therefore indicates that Defendants have no ability to watch list persons whose placement on the watch list would further Defendants' stated objectives.

**The Terror Watch List Disproportionately Targets American Muslims**

95.     The federal terror watch list and its inclusion standards disproportionately target American Muslims.

96.     In fact, almost all publicly known instances of Americans being placed on the watch list regard Muslims or persons who could be mistaken for Muslims.

97.     Additionally, government records show that Dearborn, Michigan—which is 40 percent Arab—is disproportionately represented on the federal terror watch list.  In fact,

Dearborn is among the top five cities in the country, alongside Chicago, Houston, New York, and San Diego, represented on the federal terror watch list.

98.     Due to Dearborn's significant population of Muslims, it has earned a reputation as the "Muslim Capital of America."

99.     Defendants' over-eager practice of approving watch list nominations of relatives or associates of already-listed individuals imposes overwhelming network effects in Muslim communities such as Dearborn.  One watch list nomination, even if grounded in probable cause or a preexisting criminal conviction, can rapidly spiral into nearly every member of an extended family or community mosque being deemed a potential terrorist.

100.    Defendants use impermissible and inaccurate religious profiles in order to nominate, accept, disseminate, and deploy the federal terror watch list against American Muslims in a manner that is different from other faith backgrounds.

101.    Upon information and belief, when Defendants review lists of social networks and known associates of a currently watch listed individual, they routinely chose to nominate Arab or Muslim names that cross their desk on the stereotyped basis of race, religion, or national origin alone.  Meanwhile, Defendants gloss over any stereotypically white, Christian, English, or Western-European names that may appear in the same network lists, such as classmates or colleagues.

102.    Upon information and belief, even though they facially satisfy the same known associate watch list criteria, close families and friends of convicted white-nationalist domestic terrorists are not routinely added to the federal terror watch list, while distant families and friends of innocent Muslims often discover that their mere association with other watch listees has caused them to be labeled potential terrorists.

103.    Defendants have utilized the watch list, not as a tool to enhance aviation and border security, but as a bludgeon to coerce American Muslims into becoming informants or forgoing the exercise of their rights, such as the right to have an attorney present during law enforcement questioning.

104.    By emphasizing Arab origins or Islamic faith above all else, Defendants have utilized the watch list far beyond its intended purpose.  Instead of serving as a targeted tool to enhance aviation and border security, the watch list has become a bludgeon to coerce everyday American Muslims into spying on their neighbors and becoming government informants.  Presence on the watch list is deployed as an intimidation tactic, and used to coercively justify the denial of American-Muslims' civil rights, such as the right to have an attorney present during law enforcement questioning.

105.    Public examples of this phenomenon abound.  *See Latif v. Holder*, 2014 U.S. Dist. LEXIS 85450, *19 (D. Or. June 24, 2014) (an FBI agent told Steven Washburn that he "would help remove Washburn's name from the No-Fly List if he agreed to speak to the FBI"); *Id.* at *21-22 (FBI agents told Ibraheim Mashal that "his name would be removed from the No-Fly List and he would receive compensation if he helped the FBI by serving as an informant."): *Id.* at *22-23 (FBI agents offered Amir Meshal "the opportunity to serve as a government informant in exchange for assistance in removing his name from the No-Fly List.").  *See also Fikre v. FBI*, 2014 U.S. Dist. LEXIS 73174 (D. Or. May 29, 2014) (Emirati officials told Yonas Fikre that he "could not travel to the United States by air because he is on the No-Fly List" and an FBI agent told Fikre that "the FBI could take steps to remove [him] from the No-Fly List if he agreed to be an informant."); *Tanveer v. Holder*, et. al., No. 13-cv-6951, Dkt. 15 (April 22, 2014) (Naveed Shinwari "declined to act as an informant for the

Federal Bureau of Investigation and to spy on [his] own American Muslim communities and other innocent people.").

106.    To American Muslims, the watch list is an ever-present threat of increased scrutiny and adverse consequences which descends without notice, cannot be effectively redressed, and chills their constitutionally-protected exercise of speech and religion.

### The Inadequacy of the DHS Traveler Redress Inquiry Program Process

107.    Defendants have not provided travelers, including Plaintiff and similarly situated American citizens and persons, with a clear, fair, timely, or effective mechanism through which they can challenge the TSC's decision to designate them as a potential terrorist and place them on the watch list.

108.    No single government entity is responsible for removing an individual from the list.  The FBI administers the TSC and the watch list, but does not accept redress inquiries from the public.  The NCTC which manages the TIDE list (which in turn supplies names to the TSC watch list) also does not accept redress inquiries from the public.  Neither entity directly provides final disposition letters to individuals who have submitted redress inquiries.

109.    The only redress "process" available to individuals included on the terrorist watch list is the DHS Traveler Redress Inquiry Program.   Individuals who have been denied entry or boarding, subjected to additional screening, or who otherwise suspect that they may be on the watch list, may seek redress by submitting an inquiry to DHS TRIP.  At that time, DHS TRIP provides individuals with a "Redress Control Number."

110.    DHS TRIP then submits the traveler complaints to the TSC, which determines whether any action should be taken.  The TSC has not provided any publicly available

information about how it evaluates complaints or makes that decision.  The TSC is the final arbiter of whether an individual's name is retained on or removed from the watch list, including those of Plaintiff and similarly situated American citizens and lawful permanent residents.

111.    Being removed from the No Fly List does not mean that a listee is also removed from the TSDB.

112.    The government does not provide an American citizen with a meaningful opportunity to confront, or to rebut, the grounds for his or her possible inclusion on the watch list.  No information is available to the Plaintiff or any similarly situated American citizens or persons about what specific facts the TSC considers during the redress process, and no opportunity is provided for Plaintiff or any other similarly situated American citizens or persons to contest or correct those facts.

113.    Once the TSC makes a determination regarding a particular individual's status on the watch list, including Plaintiff and similar situated American citizens or persons, it sends the result to DHS TRIP.  DHS TRIP in turn responds to the individual with a standard form letter that neither confirms nor denies the existence of any terrorist watch list records relating to the individual.

114.    In response to prior litigation, DHS TRIP letters are now required to affirmatively state whether a U.S. complainee is presently on the No Fly List.  However, DHS TRIP does not disclose Selectee List status.   The DHS TRIP letters continue to provide no information on historical watch list status, no information as to whether a person is included in the Terrorist Screening Database generally, no meaningful factual basis for the individual's

inclusion on the watch list, and no information as to whether the government has resolved the specific complaint at issue.

115.    As such, DHS TRIP offers no meaningful or substantive review of the watch list designation.  Instead, DHS TRIP operates as a mere middleman, forwarding complaints to the TSC while shielding the TSC's substantive determinations from individual, independent, or judicial review.  Thus, the only "process" available to affected individuals is to submit their names and other identifying information to DHS TRIP, a government entity that itself has no authority to provide redress, and then hope that some other unspecified government agency self-identifies an error or changes its mind.

116.    Individuals are justifiably skeptical of Defendants' willingness to engage in meaningful introspection or self-correction.  Famously, in *Ibrahim v. Department of Homeland Security, et al.,* 06-CV-00545, ECF 701-1 (N.D. Cal. Feb. 6, 2014), Defendants vigorously contested a Muslim graduate student's challenge to her No Fly List designation and subsequent revocation of her student visa.  Defendants' actions had stranded her in Malaysia for *nine years*.  Following trial, it was ultimately revealed that her placement on the No Fly List was the result of an FBI agent's error in November 2004.  He had accidentally checked the wrong box.  *Id.* at 9.

117.    The government's own internal audits of the watch list system point to serious flaws.  For example, a March 2008 DOJ Office of the Inspector General report entitled *Audit of the U.S. Department of Justice Terrorism Watchlist Nomination Processes* found significant problems with the nomination and removal process.  Rather than address those problems, Defendants' approach since 2008 has been to double-down on questionable nomination and redress practices, exponentially increasing the watch list's size and adverse consequences.

118.    The Court in *Elhady, et al., v. Piehota, et al.*, Case No. 1:16-cv-375, Dkt. 47 at 15 (E.D.V.A. 2016), recently held that the "'central meaning of procedural due process'" is that "[p]arties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified.'" *See* Exhibit 4.  The Court went on to state that the "Government's 'trust us' approach is inconsistent with the fundamental procedural protections applicable to the deprivation of a protected liberty interest, including the right to be heard." *Id.* at 16.

### Plaintiff Majeed's Placement on the No Fly List
### Prevents Him From Returning to His Home in the United States

119.    Mr. Majeed is a practicing Muslim and family man.  He is married to a United States citizen and has a four-year-old minor child.  His wife and child live in Michigan.

120.    On September 29, 2017, Mr. Majeed arrived at Detroit Metropolitan Airport (DTW) in Detroit, Michigan to board his flight to Pakistan.

121.    Once he arrived at the airport, he was prevented from printing his boarding pass.  As a result of the delays, he missed his flight and had to reschedule the flight for the following day.

122.    The following day, Mr. Majeed arrived once again to DTW to board his rescheduled flight; however, he was again prevented from printing his boarding pass.

123.    Mr. Majeed presented himself at the airline counter to inquire regarding why he is unable to print his boarding pass.

124.    Upon pulling up Mr. Majeed's information in the airline computer system, the airline representative contacted DHS in order to obtain clearance to permit Mr. Majeed to board his flight.

125.    After a significant delay, the airline representative finally was able to print Mr. Majeed's boarding pass.

126.    However, his boarding pass contained the "SSSS" designation, indicating to both him and the airline representative that he has been designated by the Defendants as a "known or suspected terrorist."

127.    As a result of the "SSSS" designation, Mr. Majeed was forced to undergo significant delays as a result of secondary screening.

128.    Once he arrived at the gate, approximately four or five TSA agents stopped him and subjected him to an additional screening and a humiliating pat down in public and in front of the other airline passengers.

129.    Once Mr. Majeed arrived at his connection in Boston Logan International Airport, TSA agents once again conducted additional screening and a humiliating pat down in public and in front of the other airline passengers by the gate for the next leg of his flight.

130.    On October 17, 2017, for his return flight back home in the United States, Mr. Majeed arrived at Allama Iqbal International Airport (LHE) in Lahore, Pakistan in order to board his flight back home to the United States.

131.    Mr. Majeed needed to return home at that time in order to continue his employment.

132.    However, once again, Mr. Majeed was prevented from printing his boarding pass and as a result, missed his flight.

133.    Moreover, he was unable to reschedule the flight and lost the money he paid for the flight.

134.    Additionally, because of Mr. Majeed's financial situation, he was forced to remain in Pakistan until he was able to gather the money needed to purchase another flight to the United States.

135.    Approximately one month later, Mr. Majeed purchased Turkish Airlines flights from Lahore, Pakistan to Istanbul, Turkey to Ontario, Canada.  From there, Mr. Majeed was scheduled to take an Air Canada flight from Ontario, Canada to Detroit, Michigan.

136.    On November 16, 2017, Mr. Majeed arrived once again at Allama Iqbal International Airport to attempt to board the rescheduled flight back to the United States.

137.    Mr. Majeed presented himself at the Turkish Airlines counter to obtain his boarding pass.

138.    After a significant delay, the Turkish Airlines representative informed Mr. Majeed that he was being prevented from boarding his flight by the United States.

139.    However, he was not provided with an explanation as to the reasons why he was being prevented from flying and returning to his home in the United States.

140.    However, by receiving instructions from the United States not to allow Mr. Majeed to board his flight, both Mr. Majeed and the airline representative reasonably inferred that Mr. Majeed was added to the No Fly List.

141.    Mr. Majeed contacted the United States Embassy in Pakistan to inquire regarding the reasons he was added to the No Fly List.

142.    The United States Embassy instructed him to file a DHS TRIP inquiry.

143.    Mr. Majeed followed the instructions given to him by the United States Embassy and immediately filed a redress request through DHS TRIP.

144.    However, as of this date, Mr. Majeed has still not received a final response from DHS.

145.    Upon information and belief Mr. Majeed was added to the No Fly List after he left the United States, and accordingly he is unable to board a flight to return to his home in the United States.

146.    Mr. Majeed intends to book a new flight and attempt once again to board a flight back to his home in the United States.

147.    However, upon information and belief, because he is on the No Fly List, he will be prevented from boarding any flight he books to the United States.

148.    As a direct result of being added onto the No Fly List, Mr. Majeed has not seen his family in over five months.

149.    Additionally, as a direct result of being added onto the No Fly List and being prevented from returning to the United States, he lost his employment.

150.    Moreover, as a result of being prevented from returning to work for several months, Mr. Majeed's employer became aware of the United States' attempts to prevent him from returning to the United States.

151.    Further, upon information and belief, Mr. Majeed's employer reasonably inferred that Mr. Majeed is designated on the watch list.

152.    Moreover, because Mr. Majeed is a legal permanent resident, the longer he is prevented from returning to the United States, the higher the risk of losing his legal permanent resident status for failure to maintain residency within the United States.

153.    Remaining outside the United States for an extended period of time is grounds for losing legal permanent status.

154. Upon information and belief, the Defendants added Mr. Majeed to the No Fly List after he exited the United States in order to force him to lose his legal permanent resident status.

155. Moreover, upon information and belief, Mr. Majeed's application for naturalization, which has been pending for nearly a year, has been unreasonably delayed by the Defendants as a result of his status on the watch list despite being qualified and eligible to receive naturalization.

156. Further, upon information and belief, Mr. Majeed's application for naturalization is being unreasonably delayed by the Defendants in order to prevent him from maintaining his residency requirements, thereby forcing him to lose eligibility and rendering him no longer qualified to obtain citizenship.

157. Prior to leaving the United States, Mr. Majeed was informed by FBI agents that he was designated on the watch list.

158. Additionally, FBI agents questioned Mr. Majeed about his upcoming trip to Pakistan; and therefore, the Defendants were aware he would be outside the country when they added him to the No Fly List.

159. At no time was Mr. Majeed given notice of the factual basis for his placement on the federal terror watch list, and at no time was he offered a meaningful opportunity to contest his designation.

160. Mr. Majeed was given no notice of the deprivation of his liberty interests or violation of his constitutional rights.

161. Upon information and belief, Mr. Majeed's nomination to and designation on the federal terror watch list was made based solely upon a hunch (based upon his race,

ethnicity, national origin, religious affiliation, guilt-by-association, or First Amendment protected activities).

162.    Upon information and belief, because Mr. Majeed is included on the federal terror watch list, and specifically the No Fly List, Defendants disseminated and are continuing to disseminate his designation as a "known or suspected terrorist" to state and local authorities (including the local police officers above), foreign governments, corporations, private contractors, airlines, gun sellers, car dealerships, financial institutions, among other official and private entities and individuals.

163.    As a result of being placed on the No Fly List without being given notice or opportunity to contest his designation, Mr. Majeed suffered injuries outlined in this Complaint and continues to sustain injury since he is still not permitted to board a flight back to his family.

164.    Upon information and belief, because Mr. Majeed is still included on the No Fly List, he remains unable to board a flight to the United States.

165.    Mr. Majeed's experience on the No Fly List is indicative of government practice, policy, and the experiences of thousands of other Americans, particularly American Muslims, who have been deemed suspected terrorists without notice and without redress.

166.    Unless Defendants or this Court allows him to board that flight, he will continue to be exiled and separated from his family without being afforded an iota of due process.

## COUNT I

### FAILURE TO PROVIDE A HEARING AND PRE-DEPRIVATION NOTICE, OR ALTERNATIVELY, POST-DEPRIVATION NOTICE IN VIOLATION OF THE FIFTH AMENDMENT RIGHT TO PROCEDURAL DUE PROCESS
**(Jurisdiction under 28 U.S.C. § 1331 and 5 U.S.C. § 702)**

167.    The foregoing allegations are realleged and incorporated herein.

168.    Defendants have placed Plaintiff's name in the Terrorist Screening Database, including on the subset No Fly List.

169.    Plaintiff has experienced economic, reputational, and liberty harms due to Defendants' placement of his name on the watch list.

170.    Plaintiff only learned that he was placed on the No Fly List after Defendants nominated and approved his name's inclusion in the federal terror watch list, after he was repeatedly denied boarding at an airport, and after the airline representative told him that he was on the No Fly List.  An FBI agent also informed Plaintiff that he was on the Watchlist.

171.    Plaintiff's experience is substantially similar to thousands of other Americans on the No Fly List, and reflects Defendants' current practices and policies.  Accordingly, Plaintiff brings this procedural due process challenge both as-applied to himself, to the category of persons who have not been arrested, charged, or convicted of a terrorism-related offense to which he belongs, and facially.

172.    Defendants' actions as described above in refusing to provide Plaintiff and other similarly situated American citizens and persons with any notice of their placement has deprived Plaintiff and other similarly situated American citizens and persons of constitutionally protected liberty interests.

173.    Defendants' actions in nominating Plaintiff and other similarly situated American citizens and persons to the federal terror watch list blatantly violate the requirement that "nominations must not be solely based on race, ethnicity, national origin, religious affiliation, or First Amendment protected activities."  49 U.S.C. § 114(h)(3).

174.    Defendants who contributed to the placement of Plaintiff and similarly situated American citizens and persons on the federal terror watch list knew that their actions violated clearly established federal law.

175.    Plaintiff and other similarly situated American citizens and persons have a liberty interest in traveling free from unreasonable burdens within, to, and from the United States, including through land border crossings and over U.S. air space.  Defendants have deprived Plaintiff and other similarly situated American citizens and persons of their right to travel on equal terms as other travelers.  Defendants have deprived Plaintiff and other similarly situated American citizens and persons of their liberty interest in traveling free from unreasonable burdens.

176.    Plaintiff and other similarly situated American citizens and persons have a right to be free from false government stigmatization as individuals who are "known or suspected to be" terrorists, or who are otherwise associated with terrorist activity. Defendants have officially imposed on Plaintiff and other similarly situated American citizens and persons the stigmatizing label of "known or suspected terrorists" without a constitutionally adequate legal mechanism for doing so.   Defendants have them disseminated the stigmatizing label to state governmental and private partners.

177.    Plaintiff and other similarly situated American citizens and persons have a liberty interest in nonattainder (i.e. the interest against being singled out for punishment

without trial). Defendants' actions have singled out Plaintiff and others similarly situated for severe punishments, despite the lack of any criminal process or judicial oversight. These punishments include, but are not limited to, Plaintiff's inability to travel by air to and from the United States, Plaintiff's inability to fulfill his religious obligation of Hajj, and Plaintiff's false association with a list of individuals suspected of terrorism.

178. Plaintiff and other similarly situated American citizens and persons, have been prevented from boarding commercial flights, have been barred from entering the United States at land border crossings, have had their bank accounts closed, have been blocked from making wire transfers at financial institutions, have lost lucrative economic opportunities, have lost the value of their purchased travel, have suffered other forms of financial harm, and have been prevented from test driving or purchasing vehicles at a car dealership.

179. All citizens adversely affected by the terrorist watch list are entitled to a constitutionally adequate legal mechanism that affords them full notice of the reasons and bases for their placement and a meaningful opportunity to contest their continued inclusion. Yet Defendants have failed to provide the most basic ingredients of due process, which is notice and a meaningful opportunity to be heard.

180. Defendants shield their watch list decisions from review, and do not provide Plaintiff or any similarly affected citizens and persons an impartial tribunal which can substantively evaluate the propriety of the Defendants' watch list inclusion standards, Defendants' adherence to their own standards, the facts purportedly justifying Plaintiff's placement on the No Fly List, any clarification or correction of those facts by the Plaintiff, or the constitutionality of Defendants' nomination or redress processes.

181.    By imposing on Plaintiff and other similarly situated American citizens and persons the stigmatizing label of "known or suspected terrorists" and by failing to provide Plaintiff and others similarly situated with a constitutionally adequate legal mechanism to challenge that designation, Defendants have deprived Plaintiff and other similarly situated American citizens and persons of their protected liberty interests.  This includes but is not limited to their liberty interests in traveling and freedom from false stigmatization.

182.    Defendants knew at the time they acted unlawfully that Supreme Court precedent required that, whenever a citizen is deprived of a liberty interest, the federal government must at least provide the deprived with some form of notice that a deprivation occurred.

183.    Defendants have violated the constitutional rights of Plaintiff and other similarly situated American citizens and persons without affording them due process of law and will continue to do so into the future if Plaintiff and other similarly situated American citizens and persons are not afforded the relief demanded below.

184.    By placing Plaintiff and other similarly situated American citizens and persons on the federal watch list, Defendants caused them an actual, imminent and irreparable injury that cannot be undone through monetary remedies.

WHEREFORE, Plaintiff requests this Honorable Court grant declaratory and injunctive relief in the form described in the Prayer for Relief below, plus all such other relief this Court deems just and proper including costs and attorneys' fees incurred in this action.

<u>**COUNT II**</u>

<u>**DEPRIVATION OF PROTECTED LIBERTIES IN VIOLATION OF FIFTH AMENDMENT
RIGHT TO SUBSTANTIVE DUE PROCESS**</u>
**(Jurisdiction under 28 U.S.C. § 1331 and 5 U.S.C. § 702)**

185.   The foregoing allegations are realleged and incorporated herein.

186.   Substantive due process protects Americans' freedom from government action which infringes upon their fundamental constitutional rights.  Government action which infringes upon these rights cannot be arbitrary, and must be narrowly tailored to serve a compelling government interest.

187.   Defendants have placed Plaintiff on the No Fly List despite lacking any reasonable suspicion that Plaintiff is a known or potential terrorist.

188.   Plaintiff's experience is substantially similar to thousands of other Americans on the No Fly List, and reflects Defendants' current practices and policies.

189.   Defendants' actions in denying Plaintiff boarding of a flight and placing him on the No Fly List have unduly deprived Plaintiff of his constitutionally protected rights, including his liberty interests in travel and freedom from false stigmatization.  By placing Plaintiff and other similarly situated American citizens and persons on the federal terror watch list, Defendants have placed an undue burden on their fundamental right of movement.

190.   Defendants' actions in nominating Plaintiff and other similarly situated American citizens and persons to the No Fly List blatantly violate the requirement that "'nominations' must not be solely based on race, ethnicity, national origin, religious affiliation, or First Amendment protected activities."  49 U.S.C. § 114(h)(3).

191.    By placing Plaintiff and other similarly situated American citizens and persons on the federal terror watch list, Defendants have treated them like second-class citizens.

192.    Defendants lack a compelling interest in placing innocent persons, particularly those with no prior terrorism related criminal record and no probable cause for suspicion of terrorism related crimes, on the federal terror watch list.

193.    Defendants' watch list lacks a compelling interest insofar as their true purpose is to provide law enforcement with a tool to harass and intimidate American Muslims, to track such persons, and coerce American Muslims into becoming informants.

194.    Defendants' watch list is not narrowly tailored insofar as the federal terror watch list is completely and demonstrably ineffective.  The defendants, for example, have never placed a person who committed a violent act of terrorism inside the United States on the No Fly List prior to the terrorist act.

195.    Defendants' actions in placing Plaintiff and other similarly situated American citizens and persons on the federal terror watch list, officially imposing on Plaintiff and other similarly situated American citizens and persons the stigmatizing label of "known or suspected terrorists," and widely disseminating the stigmatizing label to numerous governmental and private partners, are arbitrary and capricious, shock the conscience, violate the decencies of civilized conduct and are so brutal and offensive that they do not comport with the traditional ideas of fair play and decency.

196.    Because Plaintiff and other similarly situated American citizens and persons have not been charged with any crimes and are United States citizens, Plaintiff challenges his placement and the placement of others similarly situated American citizens and persons on the federal terror watch list on a broad, as-applied basis.

197.    Plaintiff's substantive due process challenge is also facial, as there are no circumstances where his placement or the placement of others similarly situated on the federal terror watch list is narrowly tailored to achieve any compelling government interest.

198.    Defendants have thus violated Plaintiff's constitutional rights and the constitutional rights of other similarly situated American citizens and persons without affording them due process of law.  Defendants will continue to do so into the future if Plaintiff and other similarly situated American citizens and persons are not afforded the relief demanded below.

199.    By placing Plaintiff and other similarly situated American citizens and persons on the federal watch list, Defendants have caused them an actual, imminent and irreparable injury that cannot be undone through monetary remedies.

WHEREFORE, Plaintiff requests this Honorable Court grant declaratory and injunctive relief in the form described in the Prayer for Relief below, plus all such other relief this Court deems just and proper including costs and attorneys' fees incurred in this action.

## COUNT III

### UNLAWFUL AGENCY ACTION IN VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. §§ 702, 706
### (Jurisdiction under 28 U.S.C. § 1331 and 5 U.S.C. § 702)

200.    The foregoing allegations are realleged and incorporated herein.

201.    Defendants' placement of Plaintiff on the terror watch list constitute agency action.

202.    Plaintiff and other similarly situated American citizens and persons are not required to exhaust the DHS TRIP process, under the holding in *Darby v. Cisneros*, 509 U.S.

137 (1993).  *See Gulet Mohamed v. Eric R. Holder, Jr., et al.,* Case No. 11-cv-00050, Dkt. 70 at 22(E.D.V.A. 2011) (Exhibit 5).

203.    Defendants' actions in placing Plaintiff and other similarly situated American citizens and persons on the federal terror watch list, officially imposing on Plaintiff the stigmatizing label of "known or suspected terrorists," disseminating the stigmatizing label to governmental and private partners, and providing no constitutionally adequate avenue for redress, were and are arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, and contrary to constitutional rights, power, privilege, or immunity, and should be set aside as unlawful pursuant to 5 U.S.C. § 706.

204.    Defendants' actions in nominating Plaintiff and other similarly situated American citizens and persons to the federal terror watch list blatantly violate the requirement that "'nominations' must not be solely based on race, ethnicity, national origin, religious affiliation, or First Amendment protected activities."  49 U.S.C. § 114(h)(3).

205.    Defendants' have failed to provide Plaintiff and other similarly situated American citizens and persons, who have been unreasonably burdened or denied boarding on commercial flights due to their placement on the federal terror watch list, with a constitutionally adequate mechanism that (a) affords them notice of the reasons and bases for their placement on the federal terror watch list and (b) provides a meaningful opportunity to contest their continued inclusion on the federal terror watch list.  Defendants' action is arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, and contrary to constitutional rights, power, privilege, or immunity, and should be set aside as unlawful pursuant to 5 U.S.C. § 706.

206. Because Plaintiff and other similarly situated American citizens and persons do not present a security threat to commercial aviation, Defendants' actions as described above in including Plaintiff and other similarly situated American citizens and persons on the federal terror watch list unreasonably burdens or prevents them from boarding commercial flights or entering the United States across the border, are arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, and contrary to constitutional rights, power, privilege, or immunity, and should be set aside as unlawful pursuant to 5 U.S.C. § 706.

207. By placing Plaintiff and other similarly situated American citizens and persons on the federal watch list, Defendants caused them an actual, imminent and irreparable injury that cannot be undone through monetary remedies.

WHEREFORE, Plaintiff requests this Honorable Court grant declaratory and injunctive relief in the form described in the Prayer for Relief below, plus all such other relief this Court deems just and proper including costs and attorneys' fees incurred in this action.

## COUNT IV

### VIOLATION OF THE FIFTH AMENDMENT (EQUAL PROTECTION) TO THE UNITED STATES CONSTITUTION
### (Jurisdiction under 28 U.S.C. § 1331 and 5 U.S.C. § 702)

208. The foregoing allegations are realleged and incorporated herein.

209. Defendants' actions in placing Plaintiff and other similarly situated American citizens and persons on the federal terror watch list, officially imposing on Plaintiff the stigmatizing label of "known or suspected terrorists," disseminating the stigmatizing label to governmental and private partners, and providing no constitutionally adequate avenue for

redress, are discriminatory and constitute an action that targets religious conduct for distinctive treatment.

210.    Plaintiff's experience is substantially similar to thousands of other Americans on the No Fly List, and reflects Defendants' current practices and policies.   Accordingly, Plaintiff brings this equal protection challenge both as-applied to himself and facially.

211.    Defendants' actions in nominating Plaintiff and other similarly situated American citizens and persons to the federal terror watch list blatantly violate the requirement that "'nominations' must not be solely based on race, ethnicity, national origin, religious affiliation, or First Amendment protected activities."  49 U.S.C. § 114(h)(3).

212.    By placing Plaintiff and other similarly situated American citizens and persons on the federal terror watch list, Defendants have treated them like second-class citizens.

213.    Defendants' above-described actions were motivated by the religious status of Plaintiff and other similarly situated American citizens and persons and on the basis of the constitutionally-protected free exercise of religion of Plaintiff and other similarly situated American citizens and persons.

214.    Defendants' above-described actions have had a discriminatory effect upon and have disparately impacted Plaintiff and other similarly situated American citizens and persons who are Muslim travelers, or who are perceived as Muslim travelers, and not travelers of other faiths.

215.    Defendants' above-described actions, policies, course of conduct, or pattern of practice that mandate or permit the above-described treatment of Plaintiff and other similarly situated American citizens and persons does not serve a compelling state interest

or a legitimate or public purpose, nor are they the least restrictive means or narrowly tailored to achieve any such interest.

WHEREFORE, Plaintiff requests this Honorable Court grant declaratory and injunctive relief in the form described in the Prayer for Relief below, plus all such other relief this Court deems just and proper including costs and attorneys' fees incurred in this action.

## COUNT V

### VIOLATION OF THE UNITED STATES CONSTITUTION – NON-DELEGATION (Jurisdiction under 28 U.S.C. § 1331 and 5 U.S.C. § 702)

216.    The foregoing allegations are realleged and incorporated herein.

217.    Congress has not provided the Executive Branch with intelligible principles from which the Executive can implement its watch list schemes regarding civil aviation and national security.

218.    Congress has not directed the Executive Branch to create either a No Fly List or a Selectee List.

219.    Congress has not authorized the Executive Branch to utilize the federal terror watch list to encourage financial institutions to close bank accounts or ban wire transfers, to encourage car dealerships to restrict test drives or purchases of vehicles, or state and local law enforcement to detain individuals based on their watch list status.

220.    Congress has not authorized the Executive Branch to disseminate the terror watch list to governmental and private partners.

221.    Homeland Security Presidential Directive 6 is an illegal usurpation of Congress' legislative function and the executive order runs afoul of separation of powers principles.

222.    The Executive Branch's assignment of the watch listing function to TSC violates Congress' directive that the TSA should determine who belongs on federal terror watch lists and the consequences that flow from being on those lists.

223.    Congress has not delegated to TSA the authority to create a process that can culminate in the removal of individuals from the TSDB.

224.    In the alternative, Congress's delegation to TSA to create a redress process is defective because the Executive Branch has allocated watch list authority in a manner that prevents TSA from creating a redress process.

225.    As a result, Defendants have illegally acted beyond their authority.

WHEREFORE, Plaintiff requests this Honorable Court grant declaratory and injunctive relief in the form described in the Prayer for Relief below, plus all such other relief this Court deems just and proper including costs and attorneys' fees incurred in this action.

## Prayer for Relief

WHEREFORE, Plaintiff respectfully requests:

A.    A declaratory judgment that Defendants' policies, practices, and customs violate the Fifth Amendment to the United States Constitution and the Administrative Procedure Act;

B.    A declaratory judgment that Defendants' policies, practices, and customs violate the non-delegation doctrine of the United States Constitution;

C.    An injunction that:

    i. requires Defendants to remedy the constitutional and statutory violations identified above, including the removal of Plaintiff from any

watch list or database that burdens or prevents him from flying or entering the United States across the border; and,

ii.  requires Defendants to provide individuals designated on the federal terror watch list with a legal mechanism that affords them notice of the reasons and bases for their placement on the federal terror watch list and a meaningful opportunity to contest their continued inclusion on the federal terror watch list;

D.  A trial by jury;

E.  An award of attorneys' fees, costs, and expenses of all litigation, pursuant to 28 U.S.C. § 2412; and,

F.  Such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

NOW COMES Plaintiff, by and through undersigned counsel, and hereby demands trial by jury of the above-references causes of actions.

Respectfully submitted,

CAIR LEGAL DEFENSE FUND

BY:     /s/ Lena Masri
LENA F. MASRI (MI: P73461) α
GADEIR I. ABBAS (VA: 81161) α β
CAROLYN M. HOMER (DC: 81161) Ω
AHMED M. MOHAMED (LA: 36590) α
453 New Jersey Ave, SE
Washington, DC 20003
Phone: (202) 488-8787

α *Admitted to practice in this Court*
β *Licensed in VA, not in D.C. Practice*
*limited to federal matters*
Ω *Admission pending*

CAIR-Michigan

BY:      /s/ Amy Doukoure
AMY DOUKOURE (MI: P80461) α
30201 Orchard Lake Road, Suite 260
Farmington Hills, MI 48334
Phone: (248) 559-2247

α *Admitted to practice in this Court*

*Counsel for Plaintiff*

Date:  March 9, 2018